BESSIE WHEELER, as Administratrix, etc., of REUBEN F. WHEELER, Deceased, Appellant, *v.* TERRY & TENCH COMPANY, Respondent.

First Department, May 4, 1917.

Master and servant — negligence — injury to assistant foreman while directing raising of load by block and tackle — assumption of risk — negligence of employee.

In an action to recover for the death of the plaintiff's husband, alleged to have been caused by the negligence of the defendant, it appeared that the decedent, an iron worker by trade, and employed as an assistant foreman, was directed to raise a load by the use of a block and tackle and to attach a tag line to hold the load clear from the structure as it was being raised; that when the load was being raised, the tag line not having been attached, a wooden block was placed by a coemployee over the edge of the platform to prevent the rope from chaffing, and that the block as the rope hit a knot hole therein spun down and hit the decedent.

*Held,* on all the evidence, that the decedent by directing a coemployee to operate the engine and thereby raise the load without having attached the tag line, assumed the risk of the accident as a matter of law;

That the action being at common law, the decedent also assumed the risk of injury from the manner in which the work was done, and from the negligence of his coemployee in using the wooden block without direction.

There being no evidence that defendant furnished the block for the purpose for which it was used, it cannot be held liable on the ground that it was defective.

SHEARN and DAVIS, JJ., dissented, with opinion.

APPEAL by the plaintiff, Bessie Wheeler, as administratrix, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 13th day of March, 1916, upon a dismissal of the complaint by direction of the court at the close of plaintiff's case.

*Grant Hoerner*, for the appellant.

*Edward F. Lindsay* [*Walter G. Evans* with him on the brief], for the respondent.

LAUGHLIN, J.:

This is an action under a statute of the State of Delaware,* to recover the damages sustained by the widow of Reuben F. Wheeler, deceased, whose death is alleged to have been caused by the negligence of the defendant, in whose employ and business he was engaged at the time he met with injuries which resulted in his death.

The defendant is a corporation organized under the laws of the State of New York, and was engaged in erecting steel structures known as derrick towers in the shipyard of the Harlan & Hollinsworth Company, in the city of Wilmington, Del.

The decedent was hired in New York in the month of February, 1914, and reported to one Manthey at the shipyard, who was in sole charge of the defendant's work. Decedent was thirty-eight years old and an ironworker by trade, and had followed that vocation for a considerable period of time prior to his entering the employ of the defendant. The terms of his employment were not shown, but he was assigned to duty by Manthey as assistant foreman or "pusher" in charge of a rivet-

* See Laws of Delaware, vol. 18, chap. 31, as amd. by vol. 22, chap. 210. Now Revised Code of Delaware (1915), § 4155. — [REP.

ing gang, consisting of himself and three other ironworkers who were sent from New York with him, and he received fifty cents a day more than the men under him. The plaintiff called Manthey as a witness and showed by him that prior to the day of the accident the decedent and his gang were engaged in riveting; but on cross-examination Manthey testified that they had been engaged in driving rivets and taking down and putting up rivets and "filling in, putting in missing members and taking down rigging and putting it up again," and to some extent in doing general ironwork and rigging work; that ironworkers as a rule do their own rigging, and that in their work on that job the ironworkers did their own rigging; that each gang did the rigging for their own particular part of the work, and that decedent had assisted in putting up and rigging up what was known as a "Chicago boom," which had been used to lift the steel and other heavy material for the towers into place.

At the time of the accident seven towers had been erected, and the ironwork on one of the towers, known as tower "C," had been *completed*. Tower "C" is described as being fifteen feet square and from sixty-two to sixty-five feet in height, with a platform on top formed by three-eighth inch steel plates, through the center of which a steel frame, described as a mast, had been erected, extending from the ground to a point from forty to forty-five feet above the platform. This mast at the platform was seven feet square and the platform extended out around it three or three and one-half feet. Channels of I-beams skirted the edges of the platform, but whether they extended above it does not appear. About eighteen inches above the platform on one side of the mast there was another platform to hold certain machinery, evidently forming part of an electrical derrick. Part of that machinery, consisting of a motor, had been placed on this platform. In the erection of the tower the Chicago boom had been used, but it had been removed to another point in the shipyard some days before the accident. Manthey testified that prior to the accident the machinery to be placed on the upper platform of the other towers had been hoisted by the use of the Chicago boom under his direction, and that on the occasion of the accident he had directed that a block and tackle which had been rigged at this

First Department, May, 1917.          [Vol. 177.

tower after the Chicago boom was removed should be used in hoisting a resistance box and controlling box onto the upper platform; but he denied that this was the only tower on which a block and tackle was used in hoisting such machinery.

On the morning of March 25, 1914, the decedent and *two* of his gang reported for duty at eight o'clock and thereupon Manthey ordered the decedent to take a resistance box and controlling box from a storeroom about 100 or 150 feet away and elevate them to this platform by use of the block and tackle; and recognizing that another man would be required to assist them in doing the work, he hired one Waller, who was waiting at the gate for employment.

The block and tackle which had been rigged on this tower, but by whom does not appear, had been used two or three days in hoisting planking, and small pieces of iron or steel, forming missing parts of the tower, and had been used in connection with rigging the Chicago boom. It consisted of a snatch block attached to the mast about six feet from the top, and a manilla rope one and a quarter inches in diameter, which ran through the snatch block, one end of it extending down on one side of the tower to be attached to the load, and the other end extending down the other side of the tower through a gate block or pulley at the base of the tower and from there to a spool on an engine which supplied the power.

The evidence tends to show that the decedent distributed the members of his gang to assist in doing this work; that Kelly was assigned to operate the engine; that either decedent or Waller or both brought the resistance box, which weighed about 125 pounds, to a point where the suspended rope was hanging; that Manthey then directed the decedent to fasten the rope to the box and to connect a tag line and to send the load up, and that in the meantime, evidently by the direction of the decedent, Nosher the other ironworker and Waller climbed to the platform with a view to receiving the load, and Waller was directed first to go to the top of the mast to release the rope which had fouled or kinked at the snatch block. According to the testimony of Manthey, after directing the decedent to fasten the rope around the box he walked toward the engine and gave no further attention to the work and was

from fifty to seventy-five feet away at the time of the accident. Neither Nosher nor Kelly was called as a witness. Waller testified that when he came down to the platform after releasing the rope he found Nosher standing on the platform near the line passing down to the load; that the line started to haul up and when the box was about fifteen feet from the ground it swung against the lower brace of the tower and fouled; that Nosher then took a wooden block about three by five inches in diameter and two feet long and put it over the edge of the platform to prevent the rope from chafing and directed the witness to hold it; that Nosher then proceeded down to push the line out and as he was going down he pushed it out or it swung out "·and it came over on my finger, the line did, and there was a knot hole in the wood and as the line hit that knot, it spun the block on down and I hollered down to Wheeler and Wheeler started to look up and it hit him on the head."

The plaintiff charged the defendant, among other things, with negligence in failing properly to instruct the decedent, in furnishing dangerous and unsafe appliances, consisting of the block and tackle, and in employing Waller, who it is alleged, was incompetent.

It does not appear that the work to which the decedent was assigned at this time was riveting work or work connected with riveting; and there is no evidence that the decedent had anything to do with the rigging of this block and tackle, or with the prior use of it, or that he knew that the block of wood was on the platform to be used or that it would be used to prevent friction between the edge of the platform and the rope, or that he gave any directions with respect thereto. With respect to the tag line Manthey testified that there was rope on the ground that could have been used as a tag line; and Waller testified that no tag line was attached to the load. There is no *direct* evidence that the decedent ever used a tag line, although it does appear that he had been previously employed as a foreman on iron work and had been so employed by the defendant. It is manifest that there would be friction between the rope and the edge of the platform unless the load was held out; but there is no express evidence with respect to the roughness of the edge of the platform or the necessity for the use of the friction block

First Department, May, 1917.          [Vol. 177.

to prevent the wearing or breaking of the rope. The inference from the evidence is that Nosher took it upon himself to use the wooden block, for Manthey testified that he was not aware that it had been used until after the accident.

One expert called by the plaintiff gave it as his opinion that it would have been difficult, if not impossible, by the use of a tag line to have held this load clear from the structure *all the way up* owing to the height; but even his testimony does not show that there would have been any difficulty, by the use of the tag line, in keeping the load away from the structure until it had been elevated to a point considerably above where it was at the time of the accident. It is fairly to be inferred, although, as already stated, there is no express evidence on the subject, that the decedent was familiar with the purpose and use of a tag line, and it must be assumed that he failed to obey the direction given to him by Manthey to attach a tag line to the load. If he did not understand the purpose for which he was directed to attach the tag line or its use, it was his duty to comply with the direction; and to ask for instructions; for, having been a foreman before, and having made no complaint with respect to lack of knowledge on the subject, Manthey had a right to assume that he knew the purpose for which the tag line was to be attached, and that he, being the only one on the ground, would use the tag line to hold the load out from coming in contact with the steel structure.

The decedent was in charge of the work and of the men, and assigned Kelly to operate the engine, and it is to be inferred that he directed Kelly to elevate the load; and in giving that direction without having attached the tag line he assumed the risk of an accident, which could have been avoided by complying with the direction of Manthey to attach the tag line and by using it for the purpose for which a tag line is intended with knowledge of which, in the circumstances he was chargeable. (See *Powers* v. *N. Y., L. E. & W. R. R. Co.*, 98 N. Y. 274.) The action being at common law the decedent also assumed the risk of injury from the manner in which the work was done and from the negligence of a fellow-servant, and, therefore, assumed the risk of injury from the negligent acts of Nosher and Waller in using, without having been directed to use, the

wooden block. (*Conyes* v. *Oceanic Amusement Co.*, 202 N. Y. 408; *Ulrich* v. *N. Y. C. & H. R. R. R. Co.*, 25 App. Div. 465; *Kaare* v. *T. S. & I. Co.*, 139 N. Y. 369; *Heilback* v. *Consumers' Brewery*, 207 id. 133; *Davis* v. *Gas Engine & Power Co.*, 148 App. Div. 791; *Vogel* v. *American Bridge Co.*, 180 N. Y. 373; *Knauss* v. *Webber Construction Co.*, 156 App. Div. 39.) The defendant cannot be held liable on the ground that the wooden block was defective owing to the fact that there was a knot hole therein, for there is no evidence that the defendant furnished the block for the purpose for which it was used.

There is no merit in the contention that Waller was not sufficiently experienced to warrant his being hired to assist in this work or that any lack of experience on his part caused or contributed to the accident.

The plaintiff called two witnesses as experts, and it is claimed that their testimony required that the question as to whether this block and tackle was a suitable appliance for this work should have been submitted to the jury. The testimony of one of them tends to show that a block and tackle is not used where the lead line would rub or chafe and in such cases a boom is used to clear the space; that whether a boom or a block and tackle should be used depends upon the height from which the lead line is suspended, and the space to be cleared and the weight of the load; and that the greater the height, the greater the space that could be cleared by the use of a tag line. The other expert testified that to prevent the lead line from rubbing or chafing, where a boom is not used, it is customary to use an appliance, where a light load is to be raised, known as a "Dutchman," consisting of a heavy plank, one end of which is secured to the platform at which the load is to be delivered, extending upwards and outwards at an angle of forty-five degrees, to the upper end of which the snatch block is attached. This witness gave it as his opinion that the load in question could not be held out all the way up by the use of a tag line so as to prevent the lead line from rubbing on the edge of the platform; but his testimony does not show that it could not have been so held out until after the load was elevated beyond the point at which it was when the accident occurred,

and the physical facts make it perfectly plain that it could have been so held out for more than that distance by the use of a tag line. Moreover, if the decedent had been where he would have been had he been using the tag line, there is no evidence tending to show that he would have been injured.

In view of the experience of the decedent and of the duties to which he was assigned at the time of the accident, I am of opinion that as matter of law he must be deemed to have assumed the risk of an accident such as that which caused his death.

It follows, therefore, that the judgment should be affirmed.

CLARKE, P. J., and DOWLING, J., concurred; DAVIS and SHEARN, JJ., dissented.

SHEARN, J. (dissenting):

In my opinion, the testimony of the plaintiff's expert witnesses was such that the question whether the defendant furnished a suitable appliance for the work ordered to be done, in the prosecution of which work plaintiff's intestate was killed, should have been submitted to the jury. This testimony showed that, in such a hoisting operation as the one involved, it was usual and customary, if a derrick were not employed, to provide and use a boom to clear the lead line from the structure, and this irrespective of whether a tag line was attached to the load. It is said that the testimony does not show that the load could not have been held out from the structure by the use of a tag line until after the load was elevated beyond the point at which it was when the accident occurred. Whether it could or could not have been so held out depends upon so many elements, the weight of the load, the strength of the workman, the height of the tower, the direction and force of the wind, and the like, that the matter is largely speculative. It is this very uncertainty, depending upon so many elements, that makes it necessary, in the exercise of reasonable prudence, to use a boom. I cannot agree that "the physical facts make it perfectly plain that it could have been so held out" by the use of a tag line, but, at any rate, the inferences to be drawn from the physical facts are, in the first instance at least, to be drawn by the jury. Giving the plain-

tiff the benefit of all inferences to be drawn from the testimony, the nonsuit was in my opinion improper and the judgment should be reversed and a new trial ordered, with costs to appellant to abide event.

DAVIS, J., concurred.

Judgment affirmed, with costs.